FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 AUG -9  PM 4: 20

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JEBACO, INC. | * | CIVIL ACTION NO. |
| | * | |
| Plaintiff, | * | |
| | * | **06 - 4175** |
| | * | SECTION |
| VERSUS | * | |
| | * | |
| HARRAH'S OPERATING CO., INC.; | * | **SECT. A MAG. 5** |
| HARRAH'S LAKE CHARLES, L.L.C.; | * | JUDGE |
| HARRAH'S STAR PARTNERSHIP; | * | |
| PLAYERS LC, L.L.C.; PLAYERS | * | |
| RIVERBOAT MANAGEMENT, L.L.C.; | * | |
| PLAYERS RIVERBOAT II, L.L.C.; and | * | MAGISTRATE |
| PINNACLE ENTERTAINMENT, INC.; and | * | |
| ABC INSURANCE COMPANIES. | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

Plaintiff, Jebaco, Inc. files this Complaint against Defendants, Harrah's Operating Company,

Harrah's Lake Charles, L.L.C., Harrah's Star Partnership, Players LC, L.L.C., Players Riverboat

Management, L.L.C., Players Riverboat II, L.L.C., Pinnacle Entertainment, Inc., and ABC Insurance

Companies.  In support of this Complaint, Plaintiff respectfully shows the Court as follows:

*350.00*
*Ca Msms*

## I. JURISDICTION AND VENUE

1.      <u>Federal Question Jurisdiction</u>. Pursuant to 28 U.S.C. § 1331, this Court has federal

question jurisdiction, as this action arises under the Sherman and Clayton Acts, 15 U.S.C. § 1 *et seq.*

and 15 U.S.C. § 12  *et seq.*, respectively.   Supplemental jurisdiction over the state law causes of

action pleaded herein arises under 28 U.S.C. § 1367, in that the state law claims are so related to the

federal question claims that they form part of the same case or controversy.

2.      <u>Venue.</u>  Venue in this district is proper.  15 U.S.C. § 22 provides that an antitrust

action against a corporation may be brought in any district where the corporation transacts business;

and 15 U.S.C. § 15 provides that anti trust actions may be brought in any district court in the district

where the defendant resides or is found or has an agent.  Upon information and belief, all or some

of the defendants transact business, reside, are found or have an agent in this district.

3.      <u>Personal Jurisdiction.</u>  Personal jurisdiction over the defendants exists because the

defendants are present, licensed to do business and/or are doing business in this judicial district,

and/or and have sufficient minimum contacts with this judicial district for this Court to maintain

jurisdiction over the defendants.

## II. PARTIES

4.      <u>Plaintiff.</u>  Jebaco, Inc.  ("Jebaco") is a corporation organized and existing under the

laws of the State of Louisiana with its principal place of business located at 601 Poydras Street, New

Orleans, Louisiana 70112.

2

5.     <u>Defendants.</u>

(a)     Harrah's Operating Company, Inc. is a Delaware corporation licensed to do and doing business in Louisiana.  (Defendants (a) - (f) may hereinafter collectively be referred to herein as "Harrah's" or "Defendants").

(b)     Harrah's Lake Charles, L.L.C. is a Louisiana limited liability company licensed to do and doing business in Louisiana.  (Defendants (a) - (f) may hereinafter collectively be referred to herein as "Harrah's" or "Defendants").

(c)     Harrah's Star Partnership is a Louisiana General Partnership licensed to do and doing business in Louisiana.  (Defendants (a) - (f) may hereinafter collectively be referred to herein as "Harrah's" or "Defendants").

(d)     Players LC, L.L.C.  is a Nevada limited liability company licensed to do and doing business in Louisiana.  (Defendants (a) - (f) may hereinafter collectively be referred to herein as "Harrah's" or "Defendants").

(e)     Players Riverboat Management, L.L.C. is a Nevada limited liability company licensed to do and doing business in Louisiana.  (Defendants (a) - (f) may hereinafter collectively be referred to herein as "Harrah's" or "Defendants").

(f)     Players Riverboat II, L.L.C.  is a Louisiana limited liability company licensed to do and doing business in Louisiana.  (Defendants (a) - (f) may hereinafter collectively be referred to herein as "Harrah's" or "Defendants").

(g)     Pinnacle Entertainment Inc. ("Pinnacle") is a Delaware corporation licensed to do and doing business in Louisiana.

3

(h)     Fictitious Defendants ABC Insurance Companies represent all of the unknown insurance companies that participated in the violations set forth in this complaint.  ABC Insurance Companies will be replaced with the specific names of such insurance companies as soon as their identities have been ascertained.

### III. GAMING IN LOUISIANA

6.     In 1990, the Louisiana Legislature and the voters passed a constitutional amendment authorizing the Louisiana Lottery. In 1991, the Legislature authorized video poker gambling devices for bars, restaurants, truckstops, racetracks and off-track betting facilities. In the same year, the Legislature passed legislation authorizing fifteen riverboat casinos statewide with a maximum of six in any one parish. In 1992, the Legislature passed legislation legalizing land-based casino gambling at the former Rivergate site in New Orleans, Louisiana.

7.     Upon information and belief, during the debates leading up to the passage of gaming in Louisiana, there was much discussion about the potential for licensees to obtain monopolistic control of the gaming industry through mergers, acquisitions and insider controlled transactions of the various applicants for licenses.

8.     The concern that one or two companies would join forces and ultimately exercise substantial control over gaming sparked an intensive debate as to whether any one holder of a gaming license should be allowed to hold multiple gaming licenses.

9.     In an effort to prevent privately held companies from obtaining a monopoly of the gaming industry, the State of Louisiana passed the Gaming Control Law which provides that "no one shall have the right obtain any license except as authorized by the Gaming Control Law ... [and that] the transfer of a license or an interest in a license issued pursuant to this Chapter is prohibited."

4

10.    Public policy dictates that: "to this end all persons, locations, practices, associations, and activities related to the operation of licensed and qualified gaming establishments ... shall be strictly regulated." LSA-R.S. 27:2 A

11.    The Legislature states in LSA-R.S. 27:2 B that no one shall have the right to obtain any license except as authorized by the Gaming Control Law and further states in LSA-R.S. 27:68A that the transfer of a license or an interest in a license issued pursuant to this Chapter is prohibited.

12.    Louisiana Administrative Code Title 42, Part VIII, section 2501, dictates statutorily that a license alone can not be sold. Customary practice has been that the only acceptable method by which to transfer a license is to sell a going concern or an asset with continuing operations along with the license.

13.    One specific intent of Louisiana's gaming laws was to give the Gaming Board the absolute right to dictate the site of each casino in Louisiana, and to prevent the circumvention of such right.

14.    One underlying rationale for strict gaming regulations is to avoid monopolistic tendencies and collusion from taking control of the gaming industry and the revenues thereby generated by fostering a competitive environment.

15.    Harrah's and Pinnacle have entered into a Purchase Agreement, detailed below, between and among themselves and the other defendants named herein to transfer two riverboat casino gaming licenses currently held by Harrah's in Lake Charles.

16.    Just twelve years after the passage of the historic gaming laws in the State of Louisiana, the defendants herein, outside of the scrutiny required by the Gaming Control Law, have joined forces through agreements and contracts to carve up the State of Louisiana in a deliberate and

5

malicious manner, in order to dictate the circumstances under which gaming can take place and where gaming operations may or may not be located.

17.    Harrah's, with three riverboat licenses and the sole land based license, and Pinnacle, with three riverboat licenses, today control nearly forty five percent (45%) of the licenses to operate casino gaming (both riverboat and land based) in the State of Louisiana (hereinafter collectively "Casino Gaming").

18.    Harrah's, with the sole land based license in New Orleans, and Pinnacle, with one of only two riverboat licenses in New Orleans, today control two thirds of the Casino Gaming licenses and 79.5% of the Casino Gaming revenue in the New Orleans Metropolitan Statistical Area ("MSA"), which contains a population of over 1.2 million people.

19.    Harrah's, with two unused riverboat licenses and Pinnacle, with one riverboat license, today control three-fifths of the Casino Gaming licenses in the Lake Charles MSA and Pinnacle alone controls 62% of the Casino Gaming revenue in the Lake Charles MSA.

20.    Harrah's and Pinnacle, each with one riverboat license, today control two-fifths of the Casino Gaming licenses in the Shreveport/Bossier MSA and 49.8% of the Casino Gaming revenue in the Shreveport/Bossier MSA.

21.    As of June 2005, Harrah's and Pinnacle generated privately between them almost sixty percent (60%) of the revenues generated in the entire State of Louisiana from riverboat and land based gaming.  The proposed transfer of the two licenses from Harrah's to Pinnacle is estimated to increase further the statewide Casino Gaming revenues controlled by these two companies.

## IV. SETTLEMENT AGREEMENT

22.     Pursuant to the terms of a lease agreement between the Players Defendants ("Players") and The Beeber Corporation ("Beeber") dated May 18 and 19, 1993, Players leased from Beeber property located at what was formerly the site of the Downtowner Hotel on Interstate 10 in Lake Charles, Louisiana (the "Property"), in order to conduct riverboat gaming operations.

23.     Pursuant to the terms of a March 9, 1993 letter agreement among Players, Beeber, Jebaco, and Elizabeth S. Woodward, Players acknowledged and agreed to comply with certain provisions of certain agreements among Beeber, Jebaco and Mrs. Woodward, establishing Jebaco's right to receive a portion of the head fee payment due to Beeber under the lease between Players and Beeber. Jebaco was entitled to a portion of these payments as consideration of the assignment to Players of Jebaco's exclusive right to lease the Property for gaming operations.

24.     Since that time, Players, and subsequently the Harrah's Defendants (who purchased Players in or about November of 2000), have operated two riverboat casinos on the premises.

25.     In 1994 and early 1995, Players and Beeber began negotiating the terms of an asset purchase agreement by which Beeber would agree to sell to Players the Property which was the subject of the lease agreement.

26.     In 1995, Jebaco filed a lawsuit against Beeber, Mrs. Woodward, Players International, Inc., and Players Lake Charles, Inc. in the 14th Judicial District Court for the Parish of Calcasieu, State of Louisiana in order to obtain an injunction preventing Beeber and Players from infringing upon the rights of Jebaco in connection with the proposed asset purchase.

27.     On or about July 27, 1995, Players, Jebaco, Beeber, Mrs. Woodward and several other related individuals entered into a Settlement Agreement (the "Settlement Agreement") that resolved

7

the pending lawsuit and set forth how all future payments by Players to Jebaco and Beeber would be made.

28.     The Settlement Agreement was executed by Jebaco in New Orleans, Louisiana.

29.     According to Section 2 of the Settlement Agreement, Players agreed to pay Jebaco a modified payment which was to be calculated based on the net number of gaming patrons entering the premises, who were to be counted in accordance with certain identified United States Coast Guard regulations. Jebaco was to receive $ 1.525 ($1.46 after June of 1996) for every net patron that entered the casinos on the Harrah's Lake Charles Property using a Coast Guard count that was allegedly required at each sailing time.  The Louisiana Legislature subsequently changed the applicable law to eliminate the sailing requirement, and the boats have since operated dockside, never leaving the dock.

30.     According to Section 2(b) of the Settlement Agreement, Players is required to submit monthly reports of the gaming patron count to the local United States Coast Guard office, which would act as an enforcement agency, and Jebaco has "the right to conduct an audit of the records necessary to verify the Coast Guard Count," which records are required to be maintained by Players for a period of two years.

31.     Jebaco originally had two mechanisms by which they could monitor Defendants' count: the Coast Guard Count and the payments Defendants made to the City of Lake Charles. However, due to a dispute between Players and the City of Lake Charles regarding the head count, the City of Lake Charles renegotiated with Players converting their payment to a percentage of the win. This effectively eliminated the head count and the second mechanism by which Jebaco could monitor its accuracy.

8

32.    Players made all payments to Jebaco from the date of the execution of the Settlement Agreement in 1995 until Players was purchased by the Harrah's Defendants in or about November 2000.

33.    Harrah's Defendants continued to make payments to Jebaco pursuant to the Settlement Agreement after purchasing Players in 2000. However, Harrah's failed to provide proper and accurate documentation to Jebaco in support of the number of gaming patrons who allegedly entered the gaming premises in accordance with the Settlement Agreement and alleged Coast Guard regulations and despite multiple requests for these records by Jebaco. The Coast Guard did not require a patron count nor did it maintain any patron count after 2000. Despite not submitting any patron count to the Coast Guard after 2000, Harrah's repeatedly blatantly misrepresented to Jebaco that they continued to do so, yet refused to provide any documentation of such submissions.

34.    The Harrah's Defendants deliberately, in bad faith and for their own economic gain, failed to conduct accurate and precise head counts at the expense of Jebaco.

35.    Section 2(b)(ii) of the Settlement Agreement discusses the "Attendant Use" of the Property. Jebaco relied upon this "Attendant Use" provision to ensure that they would be paid in the event that the vessels operated in the Lake Charles MSA.

36.    According to Section 9 of the Settlement Agreement, the terms and provisions therein were to continue in effect until either Players "(or by such successor or assign of Players who may have succeeded to Players' rights and obligations under this Agreement)" - the Harrah's Defendants - ceased gaming operations or December 7, 2023. The Settlement Agreement further provides that if Players (the Harrah's Defendants) ceases operations but then resumes operations within sixty (60)

months thereafter, the terms and provisions of the Settlement Agreement shall remain in full force and effect.

37.     Finally, according to Section 15 of the Settlement Agreement, "Any Party(ies) who fails whatsoever to comply with the terms and conditions of the Agreement is(are) obligated jointly, severally and in the alternative for, and does(do) hereby agree to pay, all reasonable attorney's fees and costs incurred by the other Party(ies) in enforcing said rights under this Agreement. The Prevailing Party(ies) in any litigation shall be the Party(ies) to whom the attorney's fees and costs are payable."

## V. HURRICANE RITA AND HARRAH'S RESPONSE

38.     On or about September 21, 2005, Hurricane Rita, which had reached Category 5 on the Saffir-Simpson Hurricane Scale in the Gulf of Mexico, began tracking towards the Louisiana-Texas border.

39.     Although several other riverboat gaming operators in Lake Charles took significant precautions to protect their vessels from the hurricane, including anchoring those vessels in the center of Lake Charles to prevent the vessels from ramming into docks or other embankments, Harrah's failed to take reasonable steps to prevent harm to its vessels. Rather, Harrah's largely abandoned its riverboats, resulting in damage to the shoreside facilities and one of the vessels, allegedly preventing their use and thus causing economic damage to Jebaco, plaintiff herein and an entity with which the Harrah's Defendants had a Settlement Agreement to pay Jebaco per casino patron, as forth in more detail herein.

40.     On September 24, 2005, Hurricane Rita made landfall as a Category 3 hurricane near the Louisiana-Texas border, causing significant wind damage in the Lake Charles, Louisiana area.

41.     Because of the Harrah's Defendants' failure to adequately protect the vessels, one of their two riverboats and the entire docking area were seriously damaged.

42.     There is sufficient information that Harrah's was desirous of leaving the Lake Charles market well before Hurricane Rita.

43.     Upon information and belief, Harrah's was exploring the possibility of a sale prior to Hurricane Rita.

44.     Shortly after Hurricane Rita, Harrah's put out an informal request to hear from entities interested in purchasing the gaming licenses and property.  While a number of others, including Jebaco, showed interest and submitted bids, none could provide the monopolistic and market manipulation value of a contract with Pinnacle.

45.     Upon information and belief, Harrah's executives did not feel that the Lake Charles facility befit the Harrah's name or was upscale enough to be a Harrah's facility.

46.     Upon information and belief, the facility would have required a substantial reinvestment by Harrah's in order to update and remarket it to the upscale brand Harrah's executives deemed necessary to befit the Harrah's name.

47.     The Lake Charles Property constituted almost a nonentity to Harrah's on a corporate level.  In 2005, it accounted for slightly more than two percent of Harrah's table games revenue (2.29%) less than two percent of Harrah's slot revenue (1.69%); less than two percent of Harrah's gaming square footage (1.82%); and less than one percent of Harrah's hotel rooms (0.60%) worldwide.

48.     It was easier for Harrah's to collude and contract with Pinnacle to monopolize and exclude competition in the Casino Gaming market than it would be for them to stay in the market

and therefore have to recapitalize, pay Jebaco pursuant to the Settlement Agreement, and pay the City of Lake Charles.

49.     Since Hurricane Rita, the Harrah's Defendants have failed to make any reasonable effort to repair or replace the riverboats or the docking area and have not conducted any gaming operations on the Property.

50.     Although one boat was only slightly damaged, Harrah's removed all gaming equipment from both boats for use at another Harrah's location.

51.     Since Hurricane Rita, the Harrah's Defendants have failed to make any payments to Jebaco or to the City of Lake Charles.

52.     Upon information and belief, the Harrah's Defendants do not intend to reopen the riverboats or any other gaming operations on the Property.

53.     Pursuant to the Settlement Agreement of July 1995, Harrah's is obliged to pay Jebaco until 2023. This fact is fundamental to understanding why Jebaco entered into the Settlement Agreement in the first place. During the negotiations which resulted in the Settlement Agreement, Jebaco was assured that it would receive payments pursuant to the Settlement Agreement throughout its term, and in fact was assured by Players that more money was going to be put into the venture, thereby making it all that much more rewarding in years to come.

54.     Despite the damage to the vessels, Harrah's has an obligation to pay Jebaco at least two million dollars ($2,000,000.00) annually for the next seventeen (17) years. Harrah's negligence, failure to perform and bad faith have caused enormous damage to Jebaco, who relied upon the economic assumption of a full term in entering into the Settlement Agreement.

12

55.    According to Harrah's 2005 Annual Report:

On September 24, 2005, Hurricane Rita hit the Gulf Coast, causing significant damage to our assets in Lake Charles, Louisiana. Insurance covers the repair or replacement of our assets that suffered loss or damage and provides coverage for interruption to our business, including lost profits. The deductible of $10 million under the policies that cover our damages and losses in Lake Charles applies both to physical damage and to business interruption. Based on estimates to date, losses have exceeded the deductible under this insurance policy, and we recorded $16.9 million in charges related to Lake Charles in the line item, "Write-downs, reserves and recoveries." We have written off property and inventories that were destroyed by Hurricane Rita and recorded receivables in anticipation of insurance proceeds that will reimburse us for those losses and for expenses that we expect to recover under our insurance programs. As of December 31, 2005, approximately $14.7 million in advances had been received from our insurance carriers, and we had net receivables of $42.9 million for which we believe collection is probable. In our review of goodwill and other intangible assets completed during fourth quarter 2005, we determined that the entire $56 million of goodwill carried at Lake Charles was impaired, and it was written off.

56.    Although Harrah's has received significant insurance benefits as a result of the damage to and the lost income from the riverboats, Jebaco has not received any portion of those insurance proceeds. Jebaco has also not received notice regarding the calculations which dictated the amount of those insurance benefits, but believes that the business interruption insurance benefits for lost profits could have been related to revenue per patron in 2004. Without the availability of the location, as provided by Jebaco, pursuant to the assignment of the option, Harrah's would not have received these insurance proceeds.

57.    To date, Jebaco has not received any notice that Harrah's has terminated the Settlement Agreement.

58.    Under Louisiana law, a settlement or compromise agreement between two or more parties entered into to resolve a dispute and avoid litigation is subject to the same principals, and is treated in the same manner as a conventional obligation for the sale or lease of goods or services.

13

Accordingly, general contract principals apply.

59.     Louisiana Civil Code Article 1821 provides: "An obligor and a third person may agree to an assumption by the later of an obligation of the former. To be enforceable by the obligee against the third person, the agreement must be made in writing. The obligee's consent to the agreement does not effect a release of the obligor. The unreleased obligor remains solidarily bound with the third person."

60.     Under the facts set forth herein, the obligor, Players, and third parties, the Harrah's Defendants, agreed to the Harrah's Defendants' assumption of Players' obligations under the Settlement Agreement. Therefore, Harrah's and Players are solidarily bound and liable.

61.     As further evidence of their solidary liability, a Harrah's press release dated August 19, 1999 provided: "Harrah's Entertainment, Inc. (NYSE: HET) today announced that it has signed a definitive agreement to acquire Players International, Inc. (NASDAQ: PLAY) in a merger transaction initiated earlier this week. Under terms of the agreement, Players' shareholders will receive $8.50 in cash for each share outstanding and Harrah's will assume $150 million of Player's debt."

## VI. PURCHASE AGREEMENT

62.     On or about May 26, 2006 Pinnacle Entertainment Inc. ("Pinnacle") and the Players and Harrah's Defendants ("Harrah's") entered into a Purchase Agreement ("Purchase Agreement") with Pinnacle as purchaser of two Casino Gaming licenses held by Harrah's.

63.     According to the Purchase Agreement, Pinnacle is aware that the majority of the real property that is the subject of the sale was damaged or destroyed by Hurricane Rita, and that there is no going concern or operating business.

64.      Subject to the terms of the Purchase Agreement, Pinnacle will acquire the property on an "as is, where is" basis, fully aware that the casino businesses are not currently operating, that there is no obligation on the part of Harrah's or Players to make such businesses operational and that the Hotel located on the Property will be closed by Harrah's Lake Charles, despite its being reopened to the public in early 2006. In fact, the Purchase Agreement specifically states that all gaming equipment has been or will be removed from the Property prior to closing.

65.      According to Section 2.1 of the Purchase Agreement, the aggregate purchase price for the Interests is a cash amount equal to seventy million dollars ($70,000,000.00) in cash, plus or minus the Purchase Price Adjustment Amount.

66.      The physical assets associated with this sale include two riverboats, a twenty-five year old, approximately two hundred and fifty room hotel; a parking garage and land on Lake Charles, all having a value in total of substantially less than the purchase price.  There is no enterprise value and no going concern.  Therefore, a substantial amount of the purchase price is simply paying for the rights to the two licenses, a transfer prohibited pursuant to La.R.S. 27:68 and Louisiana Administrative Code Title 42, Part VIII, section 2501.

67.      Defendants agreed that they would consult and cooperate with each other with respect to obtaining all such necessary approvals and authorizations of governmental entities.

68.      Section 5.5.3 of the Purchase Agreement includes specific and detailed provisions regarding the Harrah's Lake Charles Berth Approval.

69.      In Section 5.14 under the heading "Purchase Price Adjustment on Relocations of Company Permits," Pinnacle and Harrah's agree that:

15

if, within five (5) years from the Closing Date, Buyer or its successors or assigns relocate or seek approval of the LGCB or any local parish of the relocation of the operations or assets of the Companies, or either of them or the Company Gaming Licenses to the Shreveport-Bossier City, Louisiana Metropolitan Statistical Area ("MSA") or the New Orleans, Louisiana MSA (other than to relocate the Company Permit owned by [Harrah's Star Partnership] and the "Star" Riverboat to Buyer's existing Boomtown Casino in Harvey, Louisiana), Buyer will pay Seller a sum of $100 million prior to such relocation.

70.     Pinnacle and Harrah's together hold six of the fifteen riverboat gaming licenses in Louisiana, as well as the only land-based gaming license in the state, resulting in their holding nearly forty five percent (45%) of the Casino Gaming licenses granted by the state.  At present, these six licenses convert to revenues of almost sixty percent (60%) of the total statewide Casino Gaming revenue, in spite of the fact that the two licenses located at the Property in Lake Charles are not presently in use.

71.     Harrah's, holding the sole land-based gaming license in New Orleans, and Pinnacle, with one of only two riverboat licenses in New Orleans, today control two-thirds of the Casino Gaming licenses and almost 80% of the Casino Gaming revenue in the New Orleans Metropolitan Statistical Area ("MSA").

72.     Harrah's, with two unused riverboat licenses and Pinnacle, with one riverboat license, today control three-fifths of the Casino Gaming licenses and Pinnacle alone controls 62% of the Casino Gaming revenue in the Lake Charles MSA.

73.     Harrah's and Pinnacle, each with one riverboat license, today control two fifths of the Casino Gaming licenses and 49.8% of the Casino Gaming revenue in the Shreveport/Bossier MSA.

74.    Section 5.14 of the Purchase Agreement effectively thwarts any future competition for Harrah's and Pinnacle in the New Orleans MSA, the Shreveport/Bossier MSA and the Lake Charles MSA.

75.    Because the Purchase Agreement was confected for monopolistic and restraint of trade purposes, an otherwise viable site has been rendered useless.

76.    The Purchase Agreement, if allowed to proceed, will remove the Gaming Board's right to determine the location of all gaming in Louisiana and the future location of at least two of the riverboat gaming licenses, will eliminate competition, and will effectuate and perpetuate the monopoly of the Defendants, effectively allowing them to control gaming and where gaming venues are located in the State of Louisiana.

77.    Defendants' willful conduct in agreeing to such an exclusive contract clearly illustrates their specific intent to monopolize the Louisiana gaming market in at least three of the state's Metropolitan Statistical Areas.

78.    Defendants' actions have impaired competition and caused antitrust injury.

79.    The acts of Defendants constitute a violation of the antitrust laws of the United States in that they exemplify two competitors engaging in contractual relations that effectively restrain or suppress open market trade.  The particular restraint at issue here is an enjoinable horizontal restraint, clearly intended to exclude competitors. Additionally, the facts show that the parties to the Purchase Agreement have engaged in offensive monopolistic exclusionary practices.

80.    As further evidence of Defendants' intentions, section 5.14 of the Purchase Agreement calls for a separate "Letter Agreement" signed by the parties and delivered on the closing date, that will incorporate the terms of the $100 million penalty section.

17

## VII. GAMING LAW VIOLATIONS

81.     As set forth above, the Louisiana Legislature has enacted a law titled the Gaming Control Law, the intent of which is to regulate every aspect of gaming in Louisiana. Pursuant to this law, the Legislature declared the public policy of the state: "the development of a controlled gaming industry to promote economic development of the state requires thorough and careful exercise of legislative power to protect the general welfare of the state's people by keeping the state free from criminal and corrupt elements."

82.     Further public policy dictates that: "to this end all persons, locations, practices, associations, and activities related to the operation of licensed and qualified gaming establishments ... shall be strictly regulated." LSA-R.S. 27:2 A

83.     The Legislature states in LSA-R.S. 27:2 B that no one shall have the right to obtain any license except as authorized by the Gaming Control Law and further states in LSA-R.S. 27:68A that the transfer of a license or an interest in a license issued pursuant to this Chapter is prohibited.

84.     Louisiana Administrative Code Title 42, Part VIII, section 2501, dictates statutorily that a license alone can not be sold. Customary practice has been that the only acceptable method by which to transfer a license is to sell a going concern or an asset with continuing operations along with the license.

85.     Where it is shown that there are grounds to believe that a licensee has violated the Gaming Control Law, a notice of lis pendens shall be issued, specifying "the facts establishing that there are reasonable grounds to believe there is a violation of the Louisiana Gaming Control Law." LSA-R.S. 27:68.1 A.

18

86.     "Any sale, assignment, transfer, pledge, or disposition regulated by [this law] that takes place after the filing of a notice of lis pendens shall render the party to whom the sale, assignment, transfer, pledge, or disposition is made responsible for any sanction subsequently imposed upon the licensee based upon the conduct described in the notice of lis pendens." LSA-R.S. 27:68.1 B.

87.     Defendants' actions clearly constitute a violation of the Gaming Control Law and an attempt to usurp the Louisiana Gaming Control Board's powers.  By dictating in the Purchase Agreement not only locations to which the licenses cannot move, but effectively disallowing them to return to the same location, the parties to the Purchase Agreement are making a decision that only the Gaming Control Board is authorized to make.

## VIII.  ANTITRUST VIOLATIONS

88.     This antitrust action is based on the unlawful combination of all Defendants, by means of the Purchase Agreement, to establish a horizontal agreement between competitors that restrains trade by effectively excluding competition.  Defendants have also violated antitrust law by unlawfully combining to actively monopolize, attempt to monopolize and/or conspire to monopolize the gaming industry in Louisiana.

### A.     The Clayton Act

89.     The Clayton Act, 15 U.S.C. 12, *et seq*., allows for the recovery of treble damages, costs and attorney's fees as well as injunctive relief for any person injured by reason of violation of the antitrust laws.

### (i)    Section 4 of the Clayton Act

90.    Section 4 of the Clayton Act (15 U.S.C. § 15), provides in part:

§ 15.    Suits by persons injured

Except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. ... 15 U.S.C. § 15

### (ii)    Section 16 of the Clayton Act

91.    Section 16 of the Clayton Act (15 U.S.C. § 26), provides in part:

§ 26.    Injunctive relief for private parties; exception; costs

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws ... 15 U.S.C. § 26

## B.    The Sherman Act

92.    The Sherman Act (15 U.S.C. 1, *et seq*.), proscribes contracts, combinations and conspiracies in restraint of trade or commerce, as well as any person who shall monopolize, attempt to monopolize or conspire to monopolize.

### (i)    Defendants' Horizontal Combination

93.    Section 1 of the Sherman Act provides:

§ 1.    Trusts, etc., in restraint of trade illegal; penalty

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony ... 15 U.S.C. § 1

20

94.     Section 1 creates one category of the illegal restraint: a contract, combination or conspiracy in restraint of trade. However, restraints of trade have been categorized into horizontal and vertical restraints. Examples of horizontal restraints include cartels and agreements to exclude competitors.

95.     Harrah's and Pinnacle are competitors in the gaming industry.

96.     The Purchase Agreement entered into by the Defendants constitutes a horizontal combination or agreement between competitors, in that it restrains trade by effectively excluding competition.

97.     Harrah's, in contracting with Pinnacle, receives $70 million for assets worth a mere fraction of the price and two gaming licenses, yet has neatly crafted a sale that disallows those licenses from being used in any competitive fashion in a Louisiana location in which Harrah's operates, including the Shreveport/Bossier MSA and the New Orleans MSA, which consists of eight separate parishes.

98.     The $100 million relocation penalty written into the Purchase Agreement is demonstrative of the Defendants' intent to contract and combine in restraint of trade.  The value Harrah's and Pinnacle place on effectively excluding competition is $100 million, a substantial amount more than the value of the assets and more than the value of the licenses, which combined equal the purchase price of only $70 million.

99.     The market division resulting from Harrah's and Pinnacle's contractual agreement constitutes a per se violation of anti trust law.

100.    If not for this market division, Jebaco could continue to operate the Property with any other entity that operates a casino riverboat.

21

(ii)   **Pinnacle and Harrah's Monopolization of the Louisiana Gaming Industry**

101.   Section 2 of the Sherman Act provides:

§ 2.  Monopolizing trade a felony; penalty

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony ... 15 U.S.C. § 2.

102.   Section 2 creates three offenses:  monopolization, attempted monopolization, and conspiracy to monopolize. Monopolistic acts include mergers to monopolize and various exclusionary practices, including, but not limited to refusal to deal and exclusive contracts. Attempted monopolization is engaging in these kinds of monopolistic acts with the specific intent to monopolize in circumstances in which there is a "dangerous probability" of success. A conspiracy to monopolize is evidenced by deliberate concerted actions with the specific intent to achieve an unlawful monopoly, accompanied by acts in furtherance of the conspiracy.

## IX.  EFFECTS ON PLAINTIFF

103.   Jebaco has an economic interest in having both licenses utilized and having at least one remain on the current Harrah's Lake Charles Property.

104.   Pinnacle has asked the Louisiana Gaming Board to approve, for one of the licenses it intends to purchase from Harrah's, a modified berth in a different location in Lake Charles.

105.   At the Gaming Board Meeting of July 18, 2006, Pinnacle told the Board that it was actively exploring options for modifying the berth location for the second license as well.  At that meeting, neither Pinnacle nor Harrah's made mention of the fact that relocation venues for that second license would be limited to venues decided upon by Harrah's and Pinnacle because of the

22

$100 million penalty associated with enforcing their monopoly and excluding competition in numerous MSAs written into the Purchase Agreement.

106.   Defendants, through their anti-competitive conduct, have caused, and continue to cause injury to Jebaco.  Through their collusion they have effectively taken two Louisiana gaming licenses from the Lake Charles Property and dictated the manner in which and locations at which they are to be utilized.

107.   With no license being utilized on the Property, there are no Casino patrons and as a result, presently Jebaco's economic interest is eliminated.  Defendants have acted in bad faith and, as previously discussed and clearly set forth in the Settlement Agreement, Jebaco relied upon Players' assurance that Jebaco would received payments pursuant to the Settlement Agreement throughout its term of 2023, and in fact was assured by Players that more money was going to put into the venture, thereby making it all that much more rewarding in years to come.

108.   The unlawful practices complained of herein have caused and will continue to cause Jebaco irreparable harm.

## X. FIRST CAUSE OF ACTION - BREACH OF DUTY OF GOOD FAITH

109.   Plaintiff adopts by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

110.   Pursuant to Louisiana Civil Code Article 1759, good faith shall govern the conduct of the obligor and obligee in whatever pertains to the obligation.

111.     As set forth above, Harrah's was well aware of the approaching hurricane as of September 21, 2005, and could have prevented the extent of damage to the riverboats by the exercise of reasonable care and good faith.  However, Harrah's failed to protect the riverboats, causing significant damage to plaintiff herein.

112.     Additionally, although Harrah's has the ability to repair or replace the riverboats in order to continue gaming operations on the Property in short order, Harrah's has refused to take any such action and thus is not performing its obligations in good faith, causing significant damage to plaintiff herein.

113.     By failing to perform its obligations under the Settlement Agreement in good faith, Harrah's is liable to plaintiff for any and all damages incurred as a result of the damaged riverboats.

## XI.  SECOND CAUSE OF ACTION - NEGLIGENT BREACH OF CONTRACT

114.     Plaintiff adopts by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

115.     Pursuant to the Settlement Agreement, Players, and subsequently Harrah's, was and continues to be obligated to pay Jebaco based on the number of gaming patrons entering the riverboats.

116.     By failing to protect its riverboats from the hurricane in a reasonable and non-negligent manner, and by failing to take reasonable measures to repair or replace the damaged riverboats since the hurricane, Harrah's has caused damage to plaintiff, for which it is liable.

## XII.  THIRD CAUSE OF ACTION - BREACH OF CONTRACT

117.     Plaintiff adopts by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

24

118.    Louisiana Civil Code, Article 3071 provides: "A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner in which they agree, and which every one of them prefers to the hope of gaining, balanced by the danger of losing."

119.    Because Jebaco has not been paid for the full value of its interest through the year 2023, the Settlement Agreement, the contract for cessation of litigation, has been breached and Jebaco is entitled to damages.

120.    Upon information and belief, Harrah's has received insurance benefits since Hurricane Rita based on the number of patrons or on the net win per patron that would have passed its portals if not for the destruction by Hurricane Rita, and has not disclosed that number to Jebaco.

121.    Furthermore, although Harrah's has received insurance benefits for lost gaming income from these Lake Charles riverboats since Hurricane Rita, Harrah's has failed to compensate Jebaco for its portion of these benefits under the Settlement Agreement.

122.    Harrah's has breached the Settlement Agreement with Jebaco and caused damage to plaintiff, for which it is liable.

## XIII. FOURTH CAUSE OF ACTION -
## BREACH OF ACCOUNTING AND REPORTING OBLIGATION

123.    Plaintiff adopts by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

124.    Pursuant to the Settlement Agreement, Harrah's was obligated to pay Jebaco based on the number of gaming patrons entering the riverboats and, upon request, to provide all books and records necessary to verify that number.

25

125.    Harrah's failed to properly count and report the number of gaming patrons, thereby causing economic damage to Jebaco.

126.    By failing to provide plaintiff with proper documentation to support the number of gaming patrons and through its refusal to comply with the terms of the Settlement Agreement by reporting the patron count to the Coast Guard, Harrah's has breached the Settlement Agreement.

127.    Plaintiff is entitled to an order requiring Harrah's to produce reports as produced to and/or received from the Coast Guard in accordance with Section 2(b)(iv) of the Settlement Agreement and to produce any further accounting submitted to the Coast Guard after January 1, 2000.

## XIV.  FIFTH CAUSE OF ACTION - ANTITRUST VIOLATIONS

128.    Plaintiff adopts by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

129.    Defendants, through restraint of trade, have violated 15 U.S.C. § 1, *et seq.* and § 12 *et seq.*

130.    The market division resulting from Harrah's and Pinnacle's contractual agreement constitutes a per se violation of anti trust law.

131.    Defendants, through the anti-competitive conduct described herein, have made it impossible for any other entities to buy and operate the licenses at the Property.

132.    Pinnacle and Harrah's hold almost forty five percent (45%) of the state's licenses and, control more than sixty percent (60%) of the state's gaming revenue.

133.    Defendants' anti-competitive acts, unless restrained by the Court, will allow them to continue in those anti-competitive acts, causing irreparable and continuing harm to Jebaco, Inc.

134.    Defendants have acted with specific intent to obtain and maintain control over the gaming industry in Louisiana.  Plaintiff is entitled to damages as well as injunctive relief under 15 U.S.C. § 26.

135.    As a direct, foreseeable and proximate result of Defendants' unlawful practices, Plaintiff has been and will continue to be damaged by a market manipulated by Defendants. Plaintiff's injuries are of the type the antitrust laws are intended to prohibit and thus constitute antitrust injury.  Unless the activities complained of are enjoined, Plaintiff will continue to suffer immediate and irreparable injury for which Plaintiff is without adequate remedy at law.

## XV.  SIXTH CAUSE OF ACTION - UNFAIR TRADE PRACTICES

136.    Plaintiff adopts by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

137.    The Louisiana Unfair Trade Practices and Consumer Protection Law, L.S.A.-R.S. 51:1401, *et seq.*, prohibits unfair or deceptive methods, acts or practices in trade or commerce.

138.    Defendants have engaged in unfair and deceptive trade practices for the purpose and with the effect of manipulating the gaming industry in Louisiana.  As a direct consequence of such unlawful trade practices by Defendants, Jebaco, Inc. has been and continues to be damaged, including the loss of revenue and the elimination of the Property as a possible gaming venue. Jebaco has lost and will continue to lose millions of dollars in payments that should have been made pursuant to the Settlement Agreement.

139.    Defendants, through their actions, have engaged in unfair trade practices in an attempt

to disrupt and impair the business dealings of Plaintiff and others similarly situated.

140.    An injunction prohibiting Defendants from engaging in further unfair and unlawful trade practices is appropriate under the circumstances.

## XVI. SEVENTH CAUSE OF ACTION - UNJUST ENRICHMENT

141.    Plaintiff adopts by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

142.    Plaintiff asserts that Defendants have been unjustly enriched by their activities on the premises, having derived therefrom insurance proceeds for property loss and business interruption.

143.    Without the availability of the location, provided by Jebaco, Defendants would not have received these insurance proceeds.

## XVII. EIGHTH CAUSE OF ACTION - SUBROGATION

144.    Plaintiff adopts by reference and incorporates all previous allegations in all preceding paragraphs as if fully set forth herein.

145.    Louisiana Civil Code Art. 1825 defines subrogation as the substitution of one person to the rights of another.

146.    Without the availability of the location, as provided by Jebaco through the Settlement Agreement, Harrah's would not be entitled to insurance proceeds from ABC Insurance Companies.

147.    Jebaco is, therefore subrogated to Harrah's rights and entitled to at least a portion of those proceeds received by Harrah's from ABC Insurance Companies.

## XVIII. PRAYER FOR RELIEF

148.    WHEREFORE, Plaintiff respectfully requests that Defendants be cited to answer and appear herein and that upon final hearing, the Court grant Plaintiffs the following relief:

28

(a)     An injunction terminating the Purchase Agreement through which Defendants' attempt to manipulate the gaming industry, and enjoining any and all Defendants from entering into such contracts in the future;

(b)     An award of damages compensating Jebaco for injuries resulting from its inability to sell or lease its interests to any casino boat operation;

(c)     An award of damages compensating Jebaco for the loss of past, present and future payments due under the Settlement Agreement;

(d)     Awards pursuant to the Sherman Act, Clayton Act and Louisiana Unfair Trade Practices Act, trebling those damages prayed for above;

(e)     That Plaintiff recover the costs of this suit, including attorneys' fees, as provided by law; and

(f)     That the Court grant any such other relief as the Court deems just and proper.

Respectfully submitted,


**GLADSTONE N. JONES (#22221), T.A.**
**LYNN E. SWANSON (#22650)**
**PAUL H. VILLALOBOS (#22881)**
**JONES, VERRAS & FREIBERG, L.L.C.**
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Telecopier: (504) 523-2508
**Counsel for Plaintiff**