UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JEBACO, INC.                                                               CIVIL ACTION

VERSUS                                                                     NO. 06-4175

HARRAH'S OPERATING CO., INC., ET AL.                                       SECTION "T"(5)

ORDER AND REASONS

Before the Court is Motion to Dismiss, Rec. Doc. 31, filed by Defendants: Harrah's Operating Co., Inc.; Harrah's Lake Charles, LLC; Harrah's Star Partnership; Players LC, LLC; Players Riverboat Management, LLC; and Players Riverboat II, LLC (collectively, "Harrah's). Plaintiff filed two (2) oppositions addressing different sections of the Motion to Dismiss. Rec. Docs. 38, 40.  The matter came for hearing with oral argument July 18, 2007, and was taken under submission.  The Court, after considering the arguments of counsel, memoranda of the parties, the law and applicable jurisprudence, is fully advised in the premises and ready to rule.

I.   **BACKGROUND**

Prior to Hurricanes Katrina and Rita, Harrah's held two (2) casino gaming licenses in the Lake Charles area and operated two (2) riverboat casinos, a two-hundred-fifty (250) room hotel, and a parking garage near the waterfront in Lake Charles.  The site where Harrah's operated its Lake Charles riverboats was leased from the Beeber Corporation (hereinafter, "Beeber").  Plaintiff, Jebaco, Inc. (hereinafter, "Jebaco") owns an interest in the property pursuant to a contract with Beeber.

In 1995, Jebaco filed suit in state court against Players International (hereinafter, "Players"), the predecessor of Harrah's, and Beeber.  That suit involved a dispute over an attempt by Players to purchase property (in lieu of leasing and paying head count fees to Jebaco) which belonged to the

1

Beeber Corporation. Jebaco and Players entered into a Settlement Agreement (hereinafter, "SA") that resolved the pending lawsuit and set forth that all future payments to Jebaco would be made on a per patron fee[1] based upon the number of patrons entering into the riverboats.[2]

Section 2(b) of the SA gave Jebaco and Beeber "the right to conduct an audit of the records if necessary to verify the Coast Guard Count," only twice each in a twelve month period. *See* Exhibit "1" attached to Rec. Doc. 31. The records were required to be maintained by Players for a period of two (2) years. *See* Exhibit "1" attached to Rec. Doc. 31.

The term of the agreement was in effect until Players, or it's successor, voluntarily or involuntarily ceased gaming operations or December 7, 2023. The SA also provided for an award of attorneys fees in favor of the party suing to enforce the agreement and against any party in breach. *See* Exhibit "1" attached to Rec. Doc. 31.

Upon purchasing Player's in 2000, Harrah's made payments to Jebaco pursuant to the SA. In September 2005, Hurricane Rita rolled ashore and destroyed both Harrah's riverboats in Lake Charles. Harrah's has not reopened the Lake Charles riverboats nor made payment to Jebaco since that time.

In May 2006, Harrah's entered into a Purchase Agreement ("PA") with Pinnacle Entertainment, Inc. (hereinafter, "Pinnacle") for the sale of its Lake Charles assets and its two (2) gaming licenses. The PA outlined that Harrah's and Pinnacle would "consult and cooperate with

---

[1]The Settlement Agreement requires Player's to pay Jebaco a modified payment which was to be calculated based on the net number of gaming patrons entering the premises, who were to be counted in accordance with certain identified United States Coast Guard regulations. Jebaco was to receive $1.525 ($1.46 after June 1996) for every patron that entered the Riverboat casinos using a Coast Guard count prior to each sailing. *See* Exhibit "1" attached to Rec. Doc. 31.

[2]In addition to Players and Jebaco, there were six individuals which were also signatories to the settlement agreement.

each other with respect to obtaining all such necessary approvals and authorizations of government entities." Rec. Doc. 1 at paragraph 67. The original PA also contained a provision that required Pinnacle to pay Harrah's a $100 million if Pinnacle relocated the gaming operations to either Shreveport or New Orleans or Harvey, Louisiana. Rec. Doc. 1 at paragraph 69. This provision was subsequently removed. Rec. Doc. 31 at p. 4.

The PA was approved by the Louisiana Gaming Control Board (hereinafter, "LGCB") despite vocal disapproval of the transaction by Jebaco. Rec. Doc. 64 at p. 4. Further, Pinnacle's request to relocate one of the licenses to a berth at a Lake Charles location away from Jebaco's access site was approved by the LGCB. *See* Exhibit "A" attached to Pinnacle's Answer. Pinnacle has not reopened the original casino site, has obtained permission to move to another dockside berth in Lake Charles with one license, and is seeking approval to move the second license to Baton Rouge.

As a result of the aforementioned events, Jebaco filed this action against Harrah's and Pinnacle alleging: (1) state law claims for breach of the SA; (2) state law unjust enrichment; (3) state law claims to entitlement to insurance proceeds received by Harrah's for business losses sustained as a result of Hurricane Rita; (4) violations of federal antitrust laws; and (5) violations of the Louisiana Unfair Trade Practices Act ("LUPTA"). In sum, Jebaco claims it has lost, and will forever lose, revenue because the riverboats are being relocated to berths away from the property in which it has an interest. With no gaming license at its rental location, Jebaco gets no head count fee.

**II.     LOUISIANA'S GAMING LAW**

In 1991, the Louisiana Legislature passed legislation authorizing fifteen (15) riverboat casinos statewide with a maximum of six (6) in any one parish. Rec. Doc. 1 at paragraph 6. In

1996, the Legislature passed legislation legalizing one land-based casino in the state. Rec. Doc. 1 at paragraph 6. That casino is operated by Harrah's and is located in New Orleans.

Plaintiff alleges that the during the debates leading up to the passage of gaming in Louisiana, there was much discussion about potential for licensees to obtain monopolisitc control of the gaming industry through mergers, acquisitions and insider controlled transactions of the various applicants for licences; hence, there was much discussion about whether one that is granted a gaming license would be allowed to hold multiple licenses. Rec. Doc. 1 at p. 4. To prevent this situation, the Gaming Control Law was enacted. *See* LSA-R.S. 27.1, *et seq*. The public policy of Louisiana concerning gaming is expressly provided in the statute and provides:

> A. The legislature hereby finds and declares it to be the public policy of the state that the development of a controlled gaming industry to promote economic development of the state requires thorough and careful exercise of legislative power to protect the general welfare of the state's people by keeping the state free from criminal and corrupt elements. The legislature further finds and declares it to be the public policy of the state that to this end all persons, locations, practices, associations, and activities related to the operation of licensed and qualified gaming establishments and the manufacture, supply, or distribution of gaming devices and equipment shall be strictly regulated.
>
> B. It is the express intent, desire, and policy of the legislature that no gaming operator, nor any applicant for a license, permit, or other thing existing, issued, or let as a result of this Title, shall have any right of action to obtain any license, casino operating contract, permit, or the granting of the approval or affirmative board action sought except as provided for and authorized by этой Title. Any license, casino operating contract, permit, approval, or thing obtained or issued pursuant to the provisions of this Title or any other law relative to the jurisdiction of the board is expressly declared by the legislature to be a pure and absolute revocable privilege and not a right, property or otherwise, under the constitution of the United States or of the state of Louisiana. Further, the legislature declares that no recipient of any such license, casino operating contract, permit, any other thing, or affirmative board action or approval

>   acquires any vested interest or right therein or thereunder.

LSA-R.S. 27:2.  One "specific intent" of Louisiana gaming law was to give the gaming board, created by LSA-R.S. 27:11, the absolute right to dictate the site of each casino in Louisiana, and to prevent "circumvention of such right."  Rec. Doc. 1 at paragraph 13.  Further, one "underlying rationale for strict gaming regulations is to avoid monopolistic tendencies and collusion from taking control of the gaming industry and the revenues thereby generated by fostering a competitive environment."  Rec. Doc. 1 at paragraph 14.

Plaintiff alleges that the Defendants herein have "joined forces" to "carve up the State of Louisiana" in order to "dictate the circumstances under which gaming can take place and where gaming operations may or may not located" thereby violating federal and state antitrust laws by impairing competition but also violating and usurping the aforementioned gaming laws of Louisiana. Rec. Doc. 1 at paragraphs, 78, 81-85.  It is alleged that, combined, Harrah's and Pinnacle now control 45% of the gaming licenses in the state.

**III.    LAW AND ANALYSIS**

   *A.    Motion to Dismiss Standard.*

In considering a FRCP 12(b)(6) Motion to Dismiss, the Court must accept all well pleaded facts as true and view the facts in the light most favorable to the plaintiff.  *See Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996); *American Waste & Pollution Control Co. v. Browning-Ferris, Inc.*, 949 F.2d 1384, 1386 (5th Cir. 1991).  The Court must resolve doubts as to the sufficiency of the claim in the plaintiff's favor. *Vulcan Materials Company v. City of Tehauacana*, 238 F.3d 382, 387 (5th Cir. 2001).  However, "conclusory allegations" and "unwarranted deductions of fact" are not sufficient to prevent dismissal.  *United States ex. rel. Willard v. Humana Health Plan of Texas, Inc.*,

336 F.3d 375, 379 (5th Cir. 2003). Dismissal is warranted if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief. *Id.*; *Piotrowski v. City of Houston*, 51 F.3d 512, 514 (5th Cir. 1995) (quoting *Lefall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 524 (5th Cir. 1994)). Accordingly, for purposes of this Motion, all facts alleged in the Plaintiff's Complaint are accepted as true.

### B. *State Action and Noerr-Pennington*.

The Court begins with the sole federal cause of action alleged by Plaintiff, i.e., violations of the Sherman Act and the Clayton Act, because resolution of this cause of action has bearing on the Court's subject matter jurisdiction. Jurisdiction is federal question pursuant to 28 U.S.C § 1331, as there is not complete diversity of the parties.[3] The state law claims are brought pursuant to the Court's supplemental jurisdiction under 28 U.S.C § 1367. Accordingly, the Court must first determine whether any valid federal claim exists and if not, decide whether it will keep the supplemental state law claims or dismiss those claims without prejudice.

The federal claims are based upon Harrah's and Pinnacle's violating provision of the Sherman and Clayton Acts. The pertinent part of the Sherman Act, 15 U.S.C. § 1, provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony.

---

[3] Section 1332 confer federal jurisdiction over civil action where matter in controversy exceeds specified sum and is between "citizens of different States." Complete diversity of citizenship is required, that is, diversity jurisdiction does not exist unless each defendant is a citizen of a different state from each plaintiff. *Owen Equipment & Erection Co. v. Kroger*, U.S.Neb.1978, 98 S.Ct. 2396, 437 U.S. 365, 57 L.Ed.2d 274. *See also Mas v. Perry*, 489 F.2d 1396 (5th Cir. 1974) *rehearing denied* 492 F.2d 1242, *certiorari denied* 95 S.Ct. 74, 419 U.S. 842, 42 L.Ed.2d 70 (finding that complete diversity of parties is required in order that diversity jurisdiction obtain, that is, no party on one side may be a citizen of same state as any party on other side.) *Accord Harrison v. Prather*, 404 F.2d 267 (5th Cir. 1968)(complete diversity must exist for court to retain jurisdiction, and all persons on one side of controversy must be citizens of different states than all persons on other side.)

The pertinent provision of the Clayton Act, 15 U.S.C. § 15, provides in pertinent part

Except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

Plaintiff alleges that Harrah's and Pinnacle have violated these provisions. First, Plaintiff alleges that the effect of the PA gives Harrah's and Pinnacle a monopoly on casino gaming in Louisiana because, together, they control 45% of the licenses to operate gaming in the State of Louisiana, i.e. Harrah's has three of the 15 riverboat licenses and the sole land based casino and Pinnacle also has three of the 15 riverboat licenses. Rec. Doc. 1 at paragraph 17. Plaintiff further alleges that the revenues of these two (2) operators combined amounts to almost 60% of the total statewide casino gaming revenue in Louisiana. Rec. Doc. 1 at paragraph 70. Second, Plaintiff alleges that the PA stifles competition in the Louisiana gaming industry because the $100 million provision "thwarts any future competition for Harrah's and Pinnacle" in New Orleans, Shreveport/Bossier and Lake Charles. Rec. Doc. 1 at paragraph 74. Further, Plaintiff alleges that the federal antitrust laws are violated because "[t]he acts of Defendants...exemplify two competitors engaging in contractual relations that effectively restrain or suppress open market trade...." and are "clearly intended to exclude competitors." Rec. Doc.1 at paragraph 79. Finally, Plaintiff alleges that the value placed on excluding competition is $100 million; however, this amount is substantially more than the value of the assets and more than the value of the licenses, which combined equal only $70 million. Rec. Doc. 1 at paragraph 98.

In *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court rejected the contention that a program restricting the marketing of privately produced raisins,

7

adopted pursuant to California's Agricultural Prorate Act, violated the Sherman Act. Relying on principles of federalism and state sovereignty, the Court held that the Sherman Act did not apply to anticompetitive restraints imposed by the States "as an act of government." *Parker*, 317 U.S. at 352. However, this does not mean that the States may exempt private action from the scope of the Sherman Act. The Court was clear that in no way did it qualify the well-established principle that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Parker,* 317 U.S. at 351.

While *Parker* recognized the States' freedom to engage in anticompetitive regulation, it did not purport to immunize from antitrust liability the private parties who urge them to engage in anticompetitive regulation. *City of Columbia v. Omni Outdoor Advertising, Inc*. 499 U.S. 365, 379, 111 S.Ct. 1344, 1353 (1991). Thus a corollary to the *Parker* doctrine developed in the cases of *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 140, 81 S.Ct. 523, 531, 5 L.Ed.2d 464 (1961) and *Mine Workers v. Pennington*, 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965). What has been termed the *Noerr-Pennington* doctrine instructs that "the federal antitrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government." *Astoria Entertainment, Inc. v. Edwards*, 159 F.Supp.2d 303, 321 (E.D. La. 2001)(Duval, J) *quoting City of Colombia v. Omni Outdoor Advertising, Inc.* 499 U.S. 365, 11 S.Ct. 1344, 113 L.Ed.2d 382 (1991). The doctrine provides that the Sherman and Clayton Acts "do not reach political activities no matter how nefarious those activities may be." *Astoria*, 159 F. Supp. at 320.

In *Noerr,* the Court found that the Sherman Act cannot be predicated upon attempts to influence the passage or enforcement of laws and held that "the Sherman Act does not prohibit two

or more persons from associating together in an attempt to persuade the legislature or executive to take particular action with respect to a law that would produce a restraint or monopoly." *Noerr*, 365 U.S. at 136.  In *Pennington*, the Court extended *Noerr* because the activity therein entailed more than the general lobbying activity.  *Pennington's* holding immunizes lobbying directly to executive officials with commercial functions and provides that Noerr shields from the Sherman Act a concerted effort to influence public officials "regardless of intent or purpose." *Pennington,* 381 U.S. 670.  Accordingly, efforts to influence public officials will not subject individuals to liability, even when the sole purpose of the activity is to drive competitors out of business. *Pennington,* 381 U.S. at 670.

In *City of Columbia v. Omni Outdoor Advertising, Inc.* 499 U.S. 365, 11 S.Ct. 1344, 113 L.Ed.2d 382 (1991), the Court emphasized the broad nature of the *Parker* doctrine, holding that no "conspiracy exception" could overcome state immunity and affirmed its rejection of any interpretation of the Sherman Act that would allow plaintiffs to look behind the actions of state sovereigns to base their claims on perceived conspiracies to restrain trade.  *City of Columbia*, 499 U.S. at 378-79.  (internal citations and quotations omitted).  Such is *Parker's* strength that "any action that qualifies as state action is ipso facto...exempt from operation of the antitrust laws." *City of Columbia*, 499 U.S. at 379.  The *City of Columbia* Court extended the no "conspiracy exception" to the *Noerr-Pennington* doctrine as follows:

> [W]e conclude that a "conspiracy" exception to *Noerr* must be rejected....As we have described, *Parker* and *Noerr* are complementary expressions of the principle that the antitrust laws regulate business, not politics; the former decision protects the States' acts of governing, and the latter the citizens' participation in government. Insofar as the identification of an immunity-destroying "conspiracy" is concerned, *Parker* and *Noerr* generally present two faces of the same coin. The *Noerr*-invalidating conspiracy alleged

9

> here is just the Parker-invalidating conspiracy viewed from the standpoint of the private-sector participants rather than the governmental participants. The same factors which...make it impracticable or beyond the purpose of the antitrust laws to identify and invalidate lawmaking that has been infected by selfishly motivated agreement with private interests likewise make it impracticable or beyond that scope to identify and invalidate lobbying that has produced selfishly motivated agreement with public officials. "It would be unlikely that any effort to influence legislative action could succeed unless one or more members of the legislative body became ... 'co-conspirators' " in some sense with the private party urging such action, *Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220, 230 (7th 1975). And if the invalidating "conspiracy" is limited to one that involves some element of unlawfulness (beyond mere anticompetitive motivation), the invalidation would have nothing to do with the policies of the antitrust laws. In *Noerr* itself, where the private party "deliberately deceived the public and public officials" in its successful lobbying campaign, we said that "deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned." 365 U.S., at 145, 81 S.Ct., at 533.

*City of Columbia*, 499 U.S. 383-384.

There is an exception to the *Noerr-Pennington* doctrine entitled the "sham exception." This exception encompasses situations in which persons use the governmental process-as opposed to the outcome of that process-as an anticompetitive weapon. *City of Columbia,* 499 U.S. at 380. As examples, the *City of Columbia* Court noted that filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay would fall under the "sham exception." *City of Columbia*, 499 U.S. at 380 (citations omitted). A "sham" situation also involves a defendant whose activities are "not genuinely aimed at procuring favorable government action" at all, but does not include one "who 'genuinely seeks to achieve his governmental result, but *does so through improper means.'" City of Columbia, 499 U.S. at 380 citing Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500, n. 4, 10, 108 S.Ct. 1931, 1937, n. 4, 10, 100 L.Ed.2d 497 (1988) *quoting Sessions Tank*

*Liners, Inc. v. Joor Mfg., Inc.*, 827 F.2d 458, 465, n. 5 (9th 1987)).

The United States Fifth Circuit Court of Appeals acknowledges that the Supreme Court has allowed only the "sham" exception to defeat *Noerr-Pennington* immunity and refused to create a new exception for lobbying actions of a competitor in retaliation for the award of a contract. *Bayou Fleet, Inc., v. Alexander*, 234 F. 3d 852, 862 (5th Cir. 2000).

The Louisiana Legislature, by allowing only fifteen (15) gaming licenses to be distributed, has specifically laid down a policy restricting the gaming industry in Louisiana. As such, the State of Louisiana limits free competition amongst those involved in the gaming industry by restricting the number of licenses that the LGCB can provide and because it gets to decide who gets those licenses. The State's action in enacting this law and in its enforcement is, even if it restrains competition, clearly is protected by *Parker*. In *Parker*, the United States Supreme Court was clear that the "[t]he Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by the state. 63 S. Ct. at 351. "[A]s sovereign, [the state] imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." *Parker*, 63 S. Ct. at 352. Accordingly, the state's actions would be immune.

Further, the issue of gaming licenses and the application of the *Noerr-Pennington* doctrine has been previously discussed in this District. In *Astoria Entertainment, Inc. v. Edwards*, 159 F.Supp.2d 303, 321 (E.D. La. 2001), Judge Duval was faced with an action filed by a rejected riverboat gaming license applicant against licensing and other state officials, their associates and the actual recipients of gaming licenses (i.e. private, non-governmental entities). The challenge in *Astoria*, as here, involved the riverboat gaming license process. At the time, the process required that any prospective riverboat operator apply to the Riverboat Gaming Commission (hereinafter,

"the Commission") for a Certificate of Preliminary Approval. *Astoria, 159 F. Supp 2d at 309.* There were fifteen (15) such certificates available and Plaintiff, Astoria Entertainment, Inc. (hereinafter, "Astoria") applied for a Certificate but was denied. Astoria alleged that absent corruption of the licensing process by former Governor Edwin Edwards, and those connected with him, including the private, non-governmental applicants who received a license, it would have received a Certificate. *Astoria*, 159 F. Supp 2d at 309. Among other things, Astoria sued for federal antitrust violations alleging that in a "competitive environment not affected by corruption and conspiratorial tampering, [it] would have received a Certificate of Preliminary Approval and ultimately a license." *Astoria,* 159 F. Supp at 309.

All defendants moved to dismiss the antitrust claims based upon immunity under either *Parker* or *Noerr-Pennington. Astoria*, 159 F Supp. at 320. After a detailed analysis providing the history and the reasoning behind the doctrines, Judge Duval granted the Motions to Dismiss those claims. In so finding, Judge Duvall began, "as a general rule, lobbying and other efforts to obtain legislative, executive, judicial and quasi-judicial actions do not violate the antitrust laws." *Astoria*, 159 F Supp. at 322. Judge Duval rejected Plaintiff's arguments that allegations of bribery, extortion and corruption abrogate antitrust immunity as "simply an attempt to end-run the *Omni* decision, which clearly holds that illegal actions do not remove a case from the ambit of Parker and Noerr-Pennington." *Astoria*, 159 F. Supp. at 322. Further, the court found unconvincing the plaintiff's argument that the conduct in question did not involve government activity because the complaint alleged that the motivation behind the proposed "corruption...was to influence a state administrative body, the Riverboat Gaming Commission." *Astoria,* 159 F. Supp at 322. The court found that the allegations that the corporate defendants (including the private, non-governmental entities alleged

12

to have engaged in anticompetitive conduct) used former Governor Edward's political influence to persuade the commission to vote in a certain manner as "clearly [challenging] how [a state body] operates [thereby] necessarily implicating *Parker* and *Noerr Pennington*." *Astoria,* 159 F. Supp. at 323.  "The core principal to be followed is that parties who **petition, lobby, or bribe the government** for government action favorable to them cannot be prosecuted under the antitrust laws, **even when the intent of the parties is corrupt and anticompetitive** and the public official lobbies before branches of government that are not his own.  There can be no antitrust liability for those attempts to influence government bodies.  After *Omni*, this Court sees no reason to limit the reach of the antitrust immunity, regardless of the alleged miasma that permeated the licensing process." *Astoria,* 159 F. Supp 2d at 323-324 (emphasis added).  Accordingly, under *Noerr-Pennington* Judge Duval found all antitrust defendants immune from Clayton and Sherman Act liability for the political manipulation alleged.

In its Complaint, Jebaco alleges that the Louisiana legislature created the LGCB to regulate the gaming licenses in Louisiana.  Rec. Doc. 1 at paragraphs 9, 10, 11.  This includes regulation of issuance of licenses and regulation of transfer of licenses.  Plaintiff's Complaint alleges that approval and authorization of governmental entities is necessary and that "[d]efendants agreed that they would consult and cooperate... to obtain all such necessary approvals and authorizations." Rec. Doc. 1 at paragraph 67.  Plaintiff also alleges that "[o]ne specific intent of Louisiana's gaming laws was to give the Gaming Board the absolute right to dictate the site of each casino license in Louisiana, and to prevent the circumvention of such right." Rec. Doc. 1 at paragraph 13.  Harrah's and Pinnacle took its purchase agreement to the LGCB and it was approved, despite objections by Jebaco.  Under the jurisprudence discussed *supra,* Harrah's and Jebaco's motives in petitioning or

lobbying the LGCB for action that was favorable to them is irrelevant and cannot be prosecuted under the antitrust laws, even when their intent was corrupt and anticompetitive conduct as alleged. Accordingly, Jebaco's arguments that the motive and intent behind the PA be considered is without merit.

This Court finds that the conduct in question herein is not any different from that in *Astoria*. Here, Harrah's and Pinnacle petitioned the LGCB to authorize transfer of the licences and to allow Pinnacle to move the berths. The actions of the board, not the Defendants, determined whether Pinnacle and Harrah's could proceed. While the Defendants had an influence over and petitioned the LGCB to approve the transfers, i.e. to take government action favorable to them, the ultimate decision rested with the LGCB. In the absence of an affirmative decision from the board, the deal would not have occurred. Accordingly, the injury sustained by Jebaco was the result of the board's decision and sanctioned state conduct as it made the final decision, after public vote, to allow the transfer of the license and berth transfer. Jebaco now brings this action because Harah's and Pinnacle were successful in their efforts. The Court sees no distinction from the defendants conduct in successfully petitioning the LGCB herein from the conduct of the defendants in *Astoria* in successfully petitioning the Riverboat Gaming Commission for a license to the exclusion of a competitor. *Astoria* 159 F. Supp at 324. *See also Noerr*, 365 U.S. at 136 (attempt to persuade the legislature or executive to take particular action with respect to a law that would produce a restraint or monopoly is immune); *Ehlinger & Associates v. Louisiana Architects Ass'n* 989 F.Supp. 775, 784 (E.D.La.,1998)(Vance, J)(finding that if the state actor's selection process is protected by state action immunity, plaintiffs cannot end-run that immunity by suing the architects' association whose members have been awarded state work by the Board)*;*

Jebaco's reliance on language from the Fifth Circuit's opinion in *Woods Exploration and Producing Company*, 438 F. 2d 1286 (5th Cir. 1971) is unpersuasive. *Woods* is distinguishable because the thrust of the *Woods* decision rested on the Commission's reliance on false information supplied by the defendants. Jebaco argues that because the $100 million provision was included in the approval by the LGCB but later taken out by Harrah's and Pinnancle, they have committed fraud or provided "false information" to the LGCB. This argument ignores the fact that regardless of whether the $100 Million prohibiting transfer without payment was included in the contract, the LGCB had to approve any subsequent relocations. *See* LSA-R.S. 27:68.1B.

In the first of two (2) surreplies, Jebaco argues that a private, non-governmental party is protected by immunity only when the *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) two -part test is satisfied. Rec. Doc. 59 at p. 4. The *Midcal* test requires that: 1) the challenged restraint be clearly articulated and affirmatively expressed as state policy; and 2) the policy must be actively supervised by the State itself. *California Retail Liquor Dealers Ass'n*, 445 U.S. at 104-06. Both of these prongs are met in this case. First, as the Court has pointed out numerous times herein, Plaintiff's Complaint specifically asserts that the State of Louisiana extensively regulates and monitors gaming in Louisiana. *See* Rec. Doc. 1 at paragraphs 9, 10, 11. Accordingly, the State has a clear policy concerning the gaming industry including how licenses will be given out and to whom they will be given, always with LGBC approval. *See* LSA-R.S. 27.1, *et seq*. The LGBC, in accordance with the authority granted by the Legislature and in accordance with the State's policy that gaming be extensively regulated, approved the sale and transfer of the licenses from Harrah's to Pinnacle. Without the State's supervision and approval of the sale, Pinnacle could not have obtained the

15

licenses. Accordingly, Plaintiff's argument that the two-prong test is not met is without merit.

Finally, Jebaco argues that because the LGCB has not yet ruled on the second berth relocation, *Noerr* does not apply to preclude its antitrust allegations in this matter. Jebaco cites no case law on this argument, and it is misplaced because it recognizes that nothing can happen until the board approves of the relocation, regardless of the PA. The antitrust claim revolves around the provisions of the PA, which has already been approved by the LGCB. Therefore, this argument is rejected.

For the foregoing reasons, the Court finds that the Noerr-Penninginton doctrine provides immunity to Harrah's on the federal antitrust claims raised in the Complaint. Since there is not any factual circumstance that can prevent the application of the N*oerr-Penningtin* doctrine to the conduct of the Defendants herein, Harrah's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a federal antitrust claim is **GRANTED**.

### C. *Supplemental Jurisdiction*.

28 U.S.C.A. § 1367(c)(3) permits dismissal of purely State law claims where the District Court has dismissed all claims over which it has original jurisdiction. The Court has granted Harrah's Motion to Dismiss all the sole federal claims. All that remains are the issues related to and pertaining to Louisiana law. In *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court noted:

> It has been consistently recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right.
>
> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surefooted reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

> Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.

383 U.S. at 726-27, 86 S.Ct. at 1139.

As a matter of comity the Court's interference with state government should be minimized and the state courts should be the tribunals which determine and apply the litigated questions of state law raised in Plaintiff's Complaint relating to purely state law breach of contract issues, unjust enrichment, insurance contract interpretation and Louisiana's Unfair Trades Practices Law. For these reasons, this Court declines the exercise of jurisdiction over the plaintiffs' State law claims and hereby dismisses those claims without prejudice.

Accordingly,

**IT IS ORDERED** that Harrah's Motion to Dismiss (Rec. Doc. 31) is **GRANTED** as to the federal antitrust causes of action in Plaintiff's Complaint.

**IT IS FURTHER ORDERED** that the Court declines to exercise its supplemental jurisdiction of all the remaining issues related to and pertaining to Louisiana law and hereby **DISMISSES WITHOUT PREJUDICE** all of the non-federal antitrust claims.

New Orleans, Louisiana, 5th day of March, 2008.

                                              **G. THOMAS PORTEOUS, JR.**
                                              **UNITED STATES DISTRICT JUDGE**